## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

KANDI ARNHOLD & DAVID ZIMMERMAN,
JENEAN BOGGS,
STEVEN & HARRIET BORTON,
WARREN & CHERYL CAVENESS,
SUE CORLISS,
PAUL FIRSTAHL & TERESA LIGTENBERG,
NANCY & ED FOX,
MARK & APRILE GAUDINIER,
CATHIE HARRISON,
MONTE S. HULL & GARY L. HULL,
THOMAS & HEIDE ISLAND,
JOHN & VICTORIA KINGSTON,
JUDY LEWIS,
PAUL & MARGARET MCDOWELL,
BARBARA NICHOLS,
EVELYN NOVAK,
ROBERT PEETZ,
MARGE PLECKI & MICHAEL KING,
BRADLEY PORTIN & MARK WICKS,
WILLIAM & PAMELA SCHROEDER,
LAUREL SEYMOUR,
BONNIE SHAW,
REBECCA WOOD, and
MELVIN & JANET ZYLSTRA

For Themselves and as Representatives
of a Class of Similarly Situated Persons,

*Plaintiffs*,

v.

THE UNITED STATES,
*Defendant*.

No. 19-1407 L

Hon. Eric G. Bruggink

KENNETH PICKARD,

*Plaintiff*,

v.

THE UNITED STATES,
*Defendant*.

No. 19-1938 L

Hon. Eric G. Bruggink

1

## JOINT PRELIMINARY STATUS REPORT

Plaintiffs Kandi Arnhold, et al., for themselves and as representatives of a class of similarly situated persons, and Plaintiff Kenneth Pickard (collectively "Coordinated Plaintiffs"), along with Defendant the United States, submit this Joint Preliminary Status Report in accordance with Appendix A of the Rules of the United States Court of Federal Claims ("RCFC"). Pursuant to the conference with the Court held on February 11, 2020, this report also addresses coordination of proceedings in the *Arnhold et al.* case with those in *Pickard v. United States*, Case No. 19-1928L (Ct. Cl. 2019).

The parties have consulted on the topics and questions addressed in Appendix A to the RCFC and state as follows:

**A.    Jurisdiction**

Coordinated Plaintiffs and the United States agree that the Court has jurisdiction to entertain these taking claims under the Tucker Act, 28 U.S.C. § 1491, as a "claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department or upon any express or implied contract with the United States. . . ."

**B.    Consolidation and Coordination**

The parties agree that the *Arnhold et. al* case should be coordinated with *Pickard*, but need not be fully consolidated at this time. The *Arnhold et. al* case is a putative class action and *Pickard* includes a single claimant who is also seeking compensation for alleged Fifth Amendment takings of real property located on Whidbey Island resulting from increased Naval carrier landing practices, or flight "operations," occurring at Outlying Field Coupeville ("OLF Coupeville"). The parties agree that the *Pickard* and *Arnhold et. al* cases should proceed on the same schedule. Accordingly, the *Pickard* case and the *Arnhold et. al* case should have a simultaneous Early

Meeting of Counsel, common deadlines, and common discovery to the extent possible.  The Plaintiffs in the *Arnhold et. al* case and the *Pickard* case agree to make best efforts to avoid duplicative discovery requests.  All parties, including the United States, agree that consolidation is not necessary at this time.

## C.   Bifurcation

The Coordinated Plaintiffs' position:

Coordinated Plaintiffs do not believe that bifurcation is necessary or appropriate.  The issue of whether a taking has occurred is inextricably intertwined with the impact of the alleged taking and assessing the value of that impact.  Bifurcating proceedings, as the United States proposes, would lead to unnecessary delay and inefficiency, and would prejudice Coordinated Plaintiffs by prolonging the period before they can have certainty as to the status of their homes and as to whether the Navy will continue its flight operations.

Because the United States has addressed the rationale behind its proposed stay in this section of the report, Plaintiffs will do so as well.  Plaintiffs intend to oppose the United States' Motion to Stay (ECF No. 10).  The mere fact that there is a separate Administrative Procedure Act Action in the U.S. District Court for the Western District of Washington (the "APA Action") challenging the approval of the Navy's plans for increased operations at OLF Coupeville has no bearing on whether this takings action should proceed without delay.  Regardless of the outcome of the APA Action, Coordinated Plaintiffs here will need to take discovery regarding the history of flight operations at OLF Coupeville, the increased operations that began in March 2019 and remain ongoing, and the impact of those flight operations on Coordinated Plaintiffs' properties.  Likewise, the APA Action will have no bearing on class certification proceedings.  While any discontinuation of the Navy's flight operations—whether as a result of a perceived risk of liability in this action, a negotiated settlement, or a Government loss in the APA Action—could potentially

limit the amount of damages to those resulting from a temporary taking,[1] that issue can be assessed on a more complete record as trial approaches, and provides no justification for staying proceedings now.

       The United States' position:

       Consistent with the United States' Motion to Stay (ECF No. 10), this case should be stayed pending resolution of a related challenge, under the Administrative Procedure Act (the "APA"), to the Navy's increase in carrier training operations at OLF Coupeville currently pending in the United States District Court for the Western District of Washington (the "APA Action").  As set forth in detail in the Motion to Stay, it is the United States' position that resolution of the APA Action may have a substantial impact on this action because it involves a challenge to the continuation of the same Growler flight operations that underlie Plaintiffs' claims in this case.

       Nevertheless, once the stay is lifted or if this Court denies the Motion to Stay, this case should be bifurcated into a liability phase and a just compensation phase.  Following resolution of the APA Action, the Court will first need to determine whether or not the level of operations constitute a physical taking of the Coordinated Plaintiffs' property.  If this Court determines there is no liability on behalf of the United States, it will be unnecessary to consider just compensation. Accordingly, following resolution of the liability phase of these proceedings, the parties should confer and file a joint status report proposing a schedule for further proceedings, if necessary.

**D.**    **Deferral of proceedings**

       The Coordinated Plaintiffs' position:

---

[1] It is not even clear that Government loss in the APA Action would have an palpable impact on damages.  While it is certainly true that, if the Government stipulated that it would not continue to pursue approval for the current operational increase following a loss in the APA Action, damages would be reduced, absent such an agreement, the outcome of the APA Action would likely have a limited effect on damages in this case.

There is no need to defer these proceedings pending consideration of any other cases before this Court or any other tribunal. For the reasons explained above and as will be further detailed in Plaintiffs' Opposition to the United States' Motion to Stay (ECF No. 10), Coordinated Plaintiffs do not believe a stay is warranted. Coordinated Plaintiffs retained counsel to pursue their claims before the APA Action was filed, and Coordinated Plaintiffs have sought to proceed expeditiously in pursuing their claims since this case was filed. The United States requested a lengthy extension of its time to answer, delayed the Early Meeting of Counsel well beyond when plaintiffs sought to schedule it, and now seek to stay proceedings altogether. Worse yet, the Government has informed Coordinated Plaintiffs that, despite its Rule 26 disclosure obligations, it intends to unilaterally limit its disclosures to the substance of those provided in the APA Action (even though the Government acknowledges that the focus of this case turns on the events that followed the approval of the administrative record).[2] The APA Action involves separate claims and separate issues from this case, and discovery and class certification proceedings in this case will be needed regardless of any developments in the APA Action. The United States' request for further delay is not warranted.

The United States' position:

As noted above and explained in detail in the United States' Motion to Stay (ECF No. 10), this case should be stayed pending the resolution of the APA Action. The APA Action was filed two months before this case. Resolution of the APA Action will provide clarity on type of takings claim Plaintiffs can pursue and, in turn, will inform the focus and scope of the parties' discovery

---

[2] Coordinated Plaintiffs suspect that motion practice will likely be needed both to obtain complete initial disclosures from the Government and to obtain the timely production of documents responsive to Coordinated Plaintiffs' First Set of Requests For Production, which were served on February 21, 2020.

and settlement negotiations.  Nevertheless, the United States intends to serve the Coordinated Plaintiffs with its initial disclosures, consistent with the RCFC 26, on or before March 6, 2020, which disclosures will include a current copy of the administrative record filed in the APA Action. These administrative record will be provided as a supplement to—rather than a replacement for— the United States' initial disclosures.

### E.    Remand or suspension

This case does not involve any issue of remand or suspension.

### F.    Additional Parties

<u>The Coordinated Plaintiffs' Position:</u>

There are no pending motions to intervene.  The *Arnhold et. al* Plaintiffs ("Putative Class Plaintiffs") intend to seek certification as a class action under RCFC 23.  In addition to the current named Putative Class Plaintiffs who are owners of more than 30 properties in the defined affected area proximate to OLF Coupeville,[3] Putative Class Plaintiffs anticipate that a significant number of additional property owners will join the *Arnhold et. al* complaint, whether by opting in to a certified class or by joining the case as additional named plaintiffs.  Owners of approximately two dozen additional properties have retained counsel in the *Arnhold et al.* matter to pursue their claims.  Plaintiffs propose that those and any additional property owners seeking to join the *Arnhold et. al* complaint should be formally joined following the Court's ruling on class certification.

---

[3] The Putative Class Plaintiffs comprise owners of property within two proposed subclasses within a larger "affected area."  Proposed Subclass 1 is comprised of owners of all residential properties as of March 12, 2019, located in one of the Accident Potential Zones included in the Navy's Final Environmental Impact Statement.  Proposed Subclass 2 is comprised of owners of all residential properties as of March 12, 2019, located in a noise zone of 65+ dB DNL or Day-Night Average Sound Level during high tempo field-carrier landing practices, currently outlined by a Noise Contours Report at Figure 4.2-18 of the final Environmental Impact Statement.

<u>The United States' Position:</u>

The joinder of additional parties should be governed by the applicable Rules of the United States Court of Federal Claims.  Should additional plaintiffs seek to assert claims in this action outside of RCFC 23, counsel for the Coordinated Plaintiffs should confer with counsel for the United States to determine the most efficient manner to assert to those claims.  If the parties are unable to agree, any additional plaintiffs should either seek leave to amend the applicable complaint or file a separate complaint.

**G.    Dispositive motions**

The parties submit that there are no pending dispositive motions.  In both *Arnhold et. al* and *Pickard*, the United States has filed an answer.  Neither Coordinated Plaintiffs nor the United States imminently intend to file any motion pursuant to RCFC 12(c) or 56.  Following the close of discovery, the Parties agree to meet and confer and then file a joint status report proposing a mutually agreeable schedule for summary judgment briefing, if appropriate.  However, consistent with RCFC 56(b), the parties reserve their respective rights to file a motion for summary judgment at any time.

Coordinated Plaintiffs do not at this time anticipate that the issues in this case can be resolved through summary judgment.  It is the Coordinated Plaintiffs' position that the issues in this case are complex and fact-bound and there is likely to be disagreement between the parties on material facts, which would render summary judgment an inappropriate vehicle for resolving the issues in this case.  At this early point in the case, the United States does not know whether it will file a motion for summary judgment.

**H.    Relevant factual and legal issues**

<u>Coordinated Plaintiffs' statement:</u>

This is a taking case brought under the Just Compensation Clause of the Fifth Amendment, which arises out of events that occurred following the Navy's approval of an operational increase that significantly expanded its operations out of the Naval Air Station Whidbey Island ("NASWI") and OLF Coupeville.  Coordinated Plaintiffs, the individual owners of homes and real property in the affected area (and in the case of Plaintiffs in the *Arnhold et. al* case, proposed representatives on behalf of similarly situated Whidbey Island real property owners) seek just compensation for the taking of their real property by way of the Navy's implementation of its decision to ramp up flight operations.  Specifically, the operations at issue concern missions performed by the EA-18G Growler aircrafts—including the practice of touch-and-go landings—out of OLF Coupeville that will ultimately result in 24,100 annual flights circling the affected residential neighborhoods at low altitudes.  The Coordinated Plaintiffs contend that the high and unhealthful levels of noise and vibrations associated with the new operations endangers them, deprives those closest to the airstrip of the complete value of their homes and real properties, and invades their use and enjoyment of their real property resulting in a taking.

Whidbey Island is located in the Puget Sound, approximately 30 miles North of Seattle. More than 80,000 residents live on the 55-mile long island, which includes several small towns, rural areas, farms, parks, and reserves.  With sweeping views of the mountains and the Sound, large expanses of undeveloped nature preserves, farms, and many miles of parks and beaches, Whidbey Island is an idyllic location.  The island is a popular destination for tourists, retirees, and vacation home owners, and a highly desirable site for both longstanding residents and newer arrivals to make their homes.  Whidbey Island is also home to the NASWI.

OLF Coupeville is a small landing strip, isolated from the other NASWI facilities, tucked among farms and residential communities near Coupeville, Washington.  Apart from the small

landing strip itself and a small control tower, there are no other facilities at OLF Coupeville. OLF Coupeville was built in 1943, during World War II, and was initially used as a secondary landing strip. During the Vietnam War, the Navy began using OLF Coupeville for "field carrier landing practice," which simulates landing on an aircraft carrier at sea. These exercises, also known as "touch and go" landings, involve groups of several aircraft flying in patterns, with each plane then approaching the runway, touching down, and then taking off again without coming to a stop. Each aircraft makes multiple touch-and-go landings during each exercise and circles multiple times over the area neighborhoods. The Navy's use of the airstrip declined substantially after the war.

In the mid-1980s, the Navy again began increasing both the presence of the EA-6B Prowler on Whidbey Island as well as touch-and-go flights of that aircraft out of OLF Coupeville. This increase involving the Prowler resulted in a set of lawsuits that culminated in settlements in the 1990s, with the Navy acquiring a limited avigation easement over several (but far from all) properties in the area. Also during the 1990s, on information and belief, the Navy negotiated with the community of Coupeville and agreed not to conduct training flights after 10:30 PM, not to fly touch-and-go missions more than two days in a row, and not to fly on weekends. Since then, the community and the Navy have lived in relative peace, giving residents stability and predictability, and a reasonable expectation that the Navy would continue to be a good neighbor.

The Navy recently shattered that peace. In 2013, the Navy began hinting that it was interested in conducting new operations at OLF Coupeville, particularly with respect to the Growler jets. The Navy later released a draft Environmental Impact Statement ("EIS") in November 2016 outlying its plans to make NAS Whidbey Island the national hub of Growler activity and home to all of the US Growler squadrons. On June 25, 2018, the Navy announced its preferred alternative resulting in the relocation of 36 Growler aircraft to Whidbey Island as well

as 628 Naval personnel.  It also announced plans to increase annual airfield operations at the Whidbey Island Complex to more than 112,000 annually.  This includes a significant increase in touch-and-go missions at OLF Coupeville, expanding operations to 24,100 annual flights out of the small air strip that has no real permanent facilities.  *See* Environmental Impact Statement ("EIS") for EA- 18G "Growler" Airfield Operations at Naval Air Station Whidbey Island Complex, WA, Table 4.1-3 (September 2018) (figures for Alternative 2, Scenario A).  Of those flight operations, 23,700 are set to be field-carrier landing practices, representing an increase of 17,600 operations over the pre-existing number.  *Id.*  This amounts to OLF Coupeville absorbing 80% of the total field-carrier landing practice operations in the nation given that the only other field-carrier landing practice base will be Ault Field, which is also at NASWI, that will host 20% of the carrier practices.  *Id.* at §§ 4.1 & & Table 4.1-3 & 4.1.3.1.2.

The Navy's final EIS was published on September 28, 2018.  The EIS describes that the alternative the Navy has selected "would have significant noise impacts in the communities surrounding . . . OLF Coupeville."  EIS at § 4.2.3.5.  In particular the EIS acknowledges that "there would be a larger impact for the communities around OLF Coupeville under Scenario A," which is the elected scenario as compared to other scenarios that envisioned fewer touch-and-go landing practices out of OLF Coupeville.  *Id.*  In particular, the Alternative 2A DNL Noise Contour chart from the EIS includes noise contour mapping at Figure 4.2-18, showing that Plaintiffs' homes are apparently within a geographic area that experiences Day-Night Average Sound Level during high tempo field-carrier landing practices greater than 65 decibels.

Because the FAA has established 65 DNL as the threshold above which aircraft noise is considered to be incompatible with residential areas and the EIS notes that the average sound level over a 24-hour period for this area exceeds that figure, the EIS evidences that homes within this

zone are being rendered inhabitable by noise. *See* Federal Aviation Regulations Part 150. Further, on information and belief, the Growler jets are also significantly louder than predecessor jets. Now that the Navy has executed its new plan to increase the number of missions at OLF Coupeville from 6,510[4] to 24,100 annually—with more than 98% of those being flown by the Growler, real property owners have experienced loss of the enjoyment and use of their land.[5]

This is on top of the fact that many of the homes are within a danger zone for a jet crash as outlined by the EIS. The final EIS explicitly stated that the "high numbers of operations at OLF Coupeville" would "require the development of Accident Potential Zones ("APZs") through the AICUZ update process." Environmental Impact Statement for EA-18G "Growler" Airfield Operations at Naval Air Station Whidbey Island Complex, WA (September 2018). The EIS outlines what these required zones would look like for the now-selected alternative and establishes that most of the Plaintiffs' homes fall within the APZ area. *Id.*, EIS, Figure 4.3-2 Nearly the entire Admiral's Cove community is within the area designated as requiring primary APZ status. The Navy's own regulations establish these zones to protect people from the risks of aviation accidents and advise against residing within these zones, which create a closed circular pattern. Prior to now, Coupeville did not have any APZs because the last time an AICUZ study was performed, in 2005, there were not the threshold number of flights out of OLF Coupeville—deemed to be 5,000 operations annually on the same arrival, departure, or pattern flight track—to require APZs. *See* https://media.defense.gov/2019/Feb/05/2002086221/-1/-1/1/NASWIAICUZ.PDF    at    § 5.2.4

---

[4] Jessie Stensland, *Navy Releases Final EIS on Growlers*, Whidbey News-Times (September 29, 2018).
[5] *Navy Announces EIS Preferred Alternative for Growler Operations at NAS Whidbey Island and Releases NHPA Section 106 Consultation*, Press Release from the United States Fleet Forces Command, June 25, 2018; *see also* Environmental Impact Statement for EA-18G "Growler" Airfield Operations at Naval Air Station Whidbey Island Complex, WA § 2.4 (September 2018).

(noting that at OLF Coupeville, "[w]hile FCLP patter[n]s will continue to exist . . . , numbers of operations are currently projected to fall below the current level for establishment of APZ I or II at this location and therefore are not depicted").  The Navy is currently performing well over the number of threshold missions to require APZs.  On March 8, 2019, Richard Spencer—the Secretary of the Navy—issued a National Historic Preservation Act, Section 106, decision to move forward with the proposed undertaking of expanding the EA-18G Growler operations at the Whidbey Island Complex even though that decision would result in adverse indirect effects to the Central Whidbey Island Historic District.  The United States Navy's Record of Decision was signed on March 12, 2019.

The Navy immediately began increasing operations at OLF Coupeville, including touch-and-go practices, resulting in close overflights of Plaintiffs' homes nearly every day during the workweek.  The flights occur in the afternoons and evenings and night flights occur several times per week and last as late as midnight.  Jets approaching the OLF fly at very low altitude directly over the neighborhood when performing FCLP training, invading the properties with noise and vibrations sometimes into the late hours of the night, and imposing a very real danger of a jet accident.  Residents are unable to go outside, garden, walk their dogs, watch television, sleep, read, converse, or entertain because the noise from the jets is unbearable.  They also cannot plan ahead since they do not know well in advance when the planes will fly.  They are forced to keep doors and windows closed in the middle of a hot summer due to the noise and fumes from the jets.  They likewise are unable to sell their properties for full value and many are unable to sell their properties at all because full and fair disclosure of the jet traffic increase as well as the resulting uncertainty regarding the habitability of the properties scare off any potential purchasers.

Coordinated Plaintiffs' issues to be resolved:

a.   Did the Navy increase its operations out of OLF Coupeville after it issued its Record of Decision in early 2019 as part of its transfer effort to the more than 112,000 planned operations annually as denoted in the March 12, 2019 Environmental Impact Statement?

b.   Should the case proceed as a class action of all landowners in the aforementioned affected sub-class areas as of March 12, 2019?

c.   Has the operational flight increase by the United States for the EA-18G Growlers deprived owners of real property of the use and enjoyment of their land and homes such that it constitutes a taking of private property for public use within the meaning of the Fifth Amendment to the Constitution?

d.   Must the United States pay just compensation to the Coordinated Plaintiffs for the taking of their property for public use?

e.   What is the appropriate amount of just compensation, including interest, to be paid to each Plaintiff for the Government's taking of their property in violation of the Constitution?

f.   What is the appropriate amount of attorneys' fees and costs to be paid to Plaintiffs?

<u>United States' position:</u>

Consistent with Appendix A to the RCFC, the United States will limit its response to the "relevant factual and legal issues" before this Court.  In so doing, the United States does not concede or agree that the "Coordinated Plaintiffs' statement" is factually or legally correct.  A preliminary issue that is currently before the District Court for the Western District of Washington in the APA Action is whether the Coordinated Plaintiffs' claims are for a permanent physical taking or a temporary physical taking.  Once this threshold issues has been determined by a resolution of the APA Action this Court will need to determine the following issues:

a.   Should the case proceed as a class action of affected landowners and, if so, what is the

appropriate criteria for the class or subclasses?

b.  Whether the training operations approved in the Navy's Record of Decision issued on March 12, 2019, as modified by relevant judicial determinations in the APA Action, if any, constitute an increase in training operations over historical training operation levels?

c.  If the training operations approved in the Navy's Record of Decision issued on March 12, 2019, as modified by relevant judicial determinations in the APA action, constitutes an increase of its training operations over historical training operation levels, does the increase in operations deprive the Coordinated Plaintiffs of the use and enjoyment of their property such that it constitutes a taking of private property for public use within the meaning of the Fifth Amendment to the Constitution?

d.  If the Navy's operations constitute a permanent or temporary physical taking of the Coordinated Plaintiffs' property within the meaning of the Fifth Amendment, what is the appropriate amount of just compensation (if any), to be paid to each Plaintiff?

e.  If the Coordinated Plaintiffs are successful on their claims, what is the appropriate amount of attorneys' fees and costs to be paid to Plaintiffs?

## I.   Settlement

The Coordinated Plaintiffs are willing to discuss settlement at any time.

It is the United States' position that any settlement discussion prior to the resolution of the APA Action would be premature, as that action will inform the Parties as to the United States' potential liability, if any.

The Parties both agree that settlement discussions are unlikely to be productive until the parties have conducted some discovery.  If the parties succeed in pursuing settlement discussions,

they will report back to the Court and request an appropriate adjustment to the schedule to be established by the Court.  The parties further agree that they will consider the possible use of alternative dispute resolution procedures after exploration of the underlying facts.

**J.     Trial**

The parties do not request expedited trial scheduling for either the *Pickard* case or the *Arnhold et. al* case.  The Coordinated Plaintiffs believe that these cases should proceed to trial on all legal and factual issues under the schedule herein proposed.  The United States anticipates that a trial on liability—and later damages—could be appropriate depending on the results of the APA Action and the discovery process.  The parties to each action shall submit a statement regarding whether or not the cases should be consolidated for trial after the close of discovery.

Coordinated Plaintiffs each request a trial location in Island County, Washington (if possible) but will not consent to trial at NAS Whidbey Island for their respective cases.  In the alternative, Coordinated Plaintiffs each request a trial in Seattle, Washington for their respective cases.

The United States will agree to a trial in the State of Washington if the Court deems that a trial is necessary and that the State of Washington is an appropriate location for such trial. In the event that trial is held in the State of Washington, the United States suggests the trial be held in Seattle, Washington, as such location will be convenient for witnesses and also has available Federal facilities.

**K.     Electronic case management needs**

The parties at this time are not aware of any special electronic case management issues. Coordinated Plaintiffs expect that the parties will confer and cooperate on appropriate search terms and ESI protocols in accordance with best practices for electronic discovery.

**L.      Other information**

To facilitate the expeditious production of documents and electronically stored information, Coordinated Plaintiffs believe that a Federal Rule of Evidence 502(d) order would be appropriate.  The United States does not oppose the entry of a Rule 502(d) Order, provided the parties can agree on the proposed language and scope of such order.

The Parties also propose using the combined caption at **Exhibit 1** for all common filings pertaining to all Coordinated Plaintiffs.  All common filings pertaining to the Coordinated Plaintiffs shall be filed in both cases.

**M.      Proposed schedule**

The Coordinated Plaintiffs' position:

The Coordinated Plaintiffs propose that they file a motion for class certification or representative capacity on October 30, 2020, or notify the Court of their intentions with regard to this issue. The Coordinated Plaintiffs further propose that fact discovery should close on September 30, 2020, because this is ample time for the parties to complete fact discovery on jurisdictional, class certification (if required), and related merits issues.  The Coordinated Plaintiffs propose the following additional dates that would allow the parties' time to complete all fact and expert discovery:

| Date | Activity |
|---|---|
| February 21, 2020 | Service of first set of requests for production in *Arnhold* and *Pickard* |
| June 30, 2020 | Substantial completion of document production in response to first set of requests for production |
| September 30, 2020 | Close of all non-expert fact discovery |
| 60 days following entry of order on class certification | Mutual service of expert disclosures |
| 60 days following expert disclosures | Close of expert discovery |
| 30 days following close of expert discovery | Parties submit a joint status report apprising the Court of status and |

| | proposing further proceedings |
|---|---|

The United States' position:

It is the United States' position that discovery should not begin until after the Court resolves the United States' pending Motion to Stay (ECF No. 30), with the exception of exchanging initial disclosures.[6] If the Court grants the United States' Motion to Stay, then the parties can meet and confer following the resolution of the APA Action and propose a mutually acceptable schedule for conducting discovery on the liability phase of this case. If this Court does not grant the United States' Motion to Stay, then the parties should meet and confer within ten days of the Court's order denying that motion and propose a mutually acceptable schedule for conducting discovery on the liability phase of this case.

In any event, it is the United States' position that the current schedule proposed by the Coordinated Plaintiffs does not provide sufficient time for discovery. The United States anticipates seeking substantial fact discovery from the Plaintiffs. Accordingly, if this Court is inclined to enter an order allowing fact discovery to proceed during the pendency of the APA Action, the United States proposes that parties be given a year to conduct fact discovery and then file a joint status report with the Court proposing further proceedings and dates. Finally, and so as not to prejudice the United States' opportunity for full and fair fact discovery, it's the United States' position that the *Arnhold, et al.* Plaintiffs should be required to move for class consolidation after resolution of the APA Action but at least 60 days before the expiration of fact discovery.

Dated: March 2, 2020

---

[6] As part of its initial disclosures, it is the United States' intention to provide Coordinated Plaintiffs with a complete copy of the administrative record filed in the APA Action, which includes over 5,000 documents and 150,000 documents relevant to the Navy's March 12, 2019 Record of Decision.

Respectfully submitted,

*/s/ Roger J. Marzulla*
Roger J. Marzulla
Nancie G. Marzulla
MARZULLA LAW, LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)

Stephen E Morrissey
Jordan Connors
Jenna G. Farleigh
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Tel: (206)-516-3880
Fax: (302) 516-3883
smorrissey@susmangodfrey.com
jconnors@susmangodfrey.com
jfarleigh@susmangodfrey.com

*Counsel for Proposed Class Plaintiffs*

*/s/ Benjamin H. Richman*
Benjamin H. Richman
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
T: 312.589.6370
F: 312.589.6378

Robert Teel*
lawoffice@rlteel.com
LAW OFFICE OF ROBERT L. TEEL
1425 Broadway, Mail Code: 20-6690
Seattle, Washington 98122
T: (866) 833-5529
F: (855) 609-6911

Ronald A. Marron*
ron@consumersadvocates.com
LAW OFFICES OF RONALD A.
MARRON, APLC
651 Arroyo Drive
San Diego, California 92103
T: (619) 696-9006
F: (619) 564-6665

*Counsel for Kenneth Pickard*

\*Admission to be sought.

PRERAK SHAH
Deputy Assistant Attorney General

By: /s/ Brigman Harman (*with permission*)
Brigman L. Harman
United States Department of Justice
Environment & Natural Resources
Division
Natural Resources Section
150 M Street, NE
Washington, D.C. 20002
Tel: (202) 616-4119
Fax: (202) 305-0506
Email: Brigman.Harman@usdoj.gov

*Counsel for the United States*

**EXHIBIT 1**
**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| KANDI ARNHOLD & DAVID ZIMMERMAN,<br>JENEAN BOGGS,<br>STEVEN & HARRIET BORTON,<br>WARREN & CHERYL CAVENESS,<br>SUE CORLISS,<br>PAUL FIRSTAHL & TERESA LIGTENBERG,<br>NANCY & ED FOX,<br>MARK & APRILE GAUDINIER,<br>CATHIE HARRISON,<br>MONTE S. HULL & GARY L. HULL,<br>THOMAS & HEIDE ISLAND,<br>JOHN & VICTORIA KINGSTON,<br>JUDY LEWIS,<br>PAUL & MARGARET MCDOWELL,<br>BARBARA NICHOLS,<br>EVELYN NOVAK,<br>ROBERT PEETZ,<br>MARGE PLECKI & MICHAEL KING,<br>BRADLEY PORTIN & MARK WICKS,<br>WILLIAM & PAMELA SCHROEDER,<br>LAUREL SEYMOUR,<br>BONNIE SHAW,<br>REBECCA WOOD, and<br>MELVIN & JANET ZYLSTRA<br><br>For Themselves and as Representatives<br>of a Class of Similarly Situated Persons,<br><br>                     *Plaintiffs*,<br>      v.<br><br>THE UNITED STATES,<br>                   *Defendant*. | No. 19-1407 L<br><br>Hon. Eric G. Bruggink |
| KENNETH PICKARD,<br><br>                     *Plaintiff*,<br>      v.<br><br>THE UNITED STATES,<br>                   *Defendant*. | No. 19-1938 L<br><br>Hon. Eric G. Bruggink |

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2020, I electronically served the foregoing via email service to all counsel of record.

/s/ *Jenna G. Farleigh*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 2, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Roger J. Marzulla*
Attorney Signature